# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00119-CV

**McKenna Memorial Hospital, Inc.; and Robert Donovan Butter, D.O., Appellants**

**v.**

**Sandra Quinney, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
### NO. C2005-1102B, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This accelerated interlocutory appeal arises out of a health-care liability claim. Appellants McKenna Memorial Hospital, Inc., and Robert Donovan Butter, D.O., appeal the trial court's denial of their motions to dismiss appellee Sandra Quinney's lawsuit. They urge that she failed to provide a sufficient expert report as required by section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2006). Because we conclude that the trial court abused its discretion by finding that the expert report was sufficient, we reverse the trial court's orders and remand for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 23, 2003, two weeks after giving birth, appellee Quinney visited McKenna's emergency room. The intake form filled out by the triage nurse noted that Quinney complained of a two-day history of hip pain radiating down both legs. The report filled out by

Dr. Butter, the emergency room treating physician, noted the chief complaint as "LBP" (low back pain), and "radiation" was circled under the report's musculoskeletal section. Dr. Butter diagnosed Quinney with radiculopathy, a disease of the spinal nerve roots, gave her prescriptions for Motrin and a muscle relaxer, and discharged her the same day.

On February 28, 2003, Quinney returned to McKenna's emergency room, where she was diagnosed with a methicillin-resistant *Staphylococcus aureus* (MRSA) infection. She was admitted to the intensive care unit that day and discharged from the hospital on March 11, 2003.

Quinney filed suit on February 14, 2005, alleging that McKenna and Dr. Butter were negligent in failing to diagnose and treat her MRSA infection during her first visit to McKenna's emergency room.[1] She alleges that as a result of the defendants' negligence she has suffered damages, including "mitral valve problems." In support of her claims and in order to comply with section 74.351 of the civil practice and remedies code, *see id.*, Quinney proffered a report by Robert J. Lowry, M.D., which included Dr. Lowry's curriculum vitae. McKenna and Dr. Butter objected to the report and moved to dismiss Quinney's lawsuit pursuant to section 74.351. *See id.* Specifically, McKenna and Dr. Butter argued that the report failed to state the standard of care and the causal relationship between the alleged breach of the standard of care and Quinney's damages. McKenna also contended that Dr. Lowry, as a physician, was not qualified to render an expert opinion as to nursing care. The trial court determined that the report was sufficient and denied McKenna's and Dr. Butter's motions to dismiss. This accelerated interlocutory appeal followed.

---

[1] Quinney also brought suit against her obstetrician and the hospital where she delivered her baby, but she non-suited claims against both of those parties.

2

**ANALYSIS**

On appeal, McKenna and Dr. Butter urge that the trial court erred in determining the report was sufficient because the report does not discuss the standard of care and the causal relationship between the alleged breach of the standard and Quinney's damages. McKenna also argues that the trial court erred in accepting the report because Dr. Lowry is not qualified to give an expert opinion on nursing care.

*Requirements for expert report*s

In a health-care liability claim, the claimant must provide each defendant with one or more expert reports and include a curriculum vitae for each expert. *Id.* § 74.351(a). An "expert report" is defined as:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). A court must grant a motion challenging the adequacy of the report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l*).

Because the statute focuses on what the report should discuss, the only information relevant to the inquiry is within the four corners of the document. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the

3

statute. *Id.* To constitute a good faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit. *Id.* at 879. A report does not fulfill these two purposes if it fails to address the standard of care, breach of the standard, and causation, or if it only states the expert's conclusions regarding these elements. *Id.*

Failure to serve an adequate expert report mandates dismissal with prejudice. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b). However, if an expert report cannot be considered served because elements of the report are found to be deficient, the trial court has discretion to grant one thirty-day extension to the claimant to cure the deficiency. *Id.* § 74.351(c).

*Standard of review*

We review a trial court's ruling on a motion to dismiss under section 74.351(*l*) for an abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam) (citing *Palacios*, 46 S.W.3d at 877-78). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Gutierrez*, 111 S.W.3d 56, 63 (Tex. 2003).

*Report of Dr. Lowry*

In Dr. Lowry's three-and-one-half-page report, he opines that the problems in the health care Quinney received began with the nursing care during Quinney's first emergency room

visit. In discussing how the triage nurse filled out the intake form, he states:

> The interesting concern about how this page was filled out, is that despite the fact that this patient was two-weeks post-partum, and she was having pain anywhere near the pelvis, with a mild fever to boot, the GU, the GYN, and the Abdomen sections of the form were checked-off as "N/A" (not applicable). These areas should have been at the top of the concern here. It appears to me that the triage nurse got stuck on the idea that this was a musculoskeletal issue and did not even consider that there was a potential post-partum medical issue at hand, despite the prompting via the pre-printed form.
>
> . . . .
>
> The exam by the triage nurse totally dismisses an OB/Gyn possibility here, which becomes one of the early mistakes in my opinion.

After discussing the performance of the triage nurse, Dr. Lowry reviews Dr. Butter's examination

of Quinney:

> Here I see a few problems and the following bullet points will set-through my thinking here:
> 1. The patient presents and thus is known to have pain around the low back, hip, and down into the lower extremies;
> 2. She gave a history of being 2-weeks post partum;
> 3. a mild fever was noted at triage time, and her pulse is 123bpm;
> With just that information above, most doctors I know would automatically be thinking a Gyn/Ob issue is possibly going on here and the "hip" or low-back pain may be being caused by this. There is also the chance that she truly has a direct low-back pain issue from a musculoskeletal standpoint given she has recently delivered a child. Both possibilities needed to be evaluated.
>
> . . . .
>
> [W]hen the physician (Dr. Don Butler?) performs his history, he does not inquire about the noted (and already given) history of the 2-weeks post-partum issue, or of fevers, or anything else down that pathway, but just writes a brief note of the LBP. It appears he had already made his diagnoses before even seeing the patient. Worse yet, his exam was not one which was inclusive enough to actually have been

5

examining for the cause of the LBP (essentially no orthopedic tests were listed as being performed). So although he came up with a diagnoses of "radiculopathy", his exam notes do not reflect such findings (no SLR test even being done, no neuro deficits found in the lower extremities, etc.) sufficient enough to lead anyone to come up with that diagnoses. Also, the intake form listed "hip" pain, he listed LBP (low back pain) as the chief complaint. Although these two areas (hip and low back) [sic], the situation is such that the pain was apparently not specific enough to pinpoint one small spot and should have further lead the doctor to investigate the nature of the pain further. There is no listed characterization, or investigation of the nature of the pain listed in the history. So he did not take a thorough enough history, and failed to perform a thorough enough exam to even justify the "radiculopathy" diagnoses, let alone an ER visit for (any) pain, in a woman who also has a fever, and rapid pulse and being 2-weeks post partum. Furthermore, with what little he did do for an exam, his findings actually go away from a true radiculopathy – which again should have led him to investigate things further. The worst thing is that he neglected to do a thorough history (and thus missed the OB issue completely), and then did not examine the patient to the extent that the history (at least the one written down by the triage nurse) should have had him delve into the possibility of an OB etiology – and most of those options on the differential would be extremely life-threatening. He didn't even take any labs (from a person complaining of pain anywhere close to the pelvis, and two weeks out from a delivery!) – any one of several would have likely pointed towards the presence of a significant problem.

Dr. Lowry then discusses Quinney's second visit to the McKenna emergency room, identifying as a mistake that Quinney was released even though "she was noted to have a fever just a few hours before release." He states that "she should not have been released unless she was afebrile for at least a whole uninterrupted 24 hours immediately prior to release."

In summarizing his comments, Dr. Lowry states, in part:

[I]t appears to me that the Triage nurse for the ER visit of 2/23 was provided [sic] sub-par treatment/care (for not at least recognizing the possibility of a Ob/gyn problem existing and evaluating and recording such), and certainly for the ER doc that day who clearly didn't recognize the significant potential of an OB/gyn issue being at the root of the visit, and also for performing a sub-standard evaluation for the history presented by the patient to the ER, and even for a radiculopathy for that matter. Likely, had the source of the problem actually been looked for (simple labs

6

and a minimally complete physical exam) at this visit, the answers would have been staring them right in the eye and she would have been admitted that day, and undergone a much less exhaustive course the next couple months.

*Standard of care*

In health-care liability claims, the standard of care is defined by what an ordinarily prudent health-care provider or physician would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880; *Strom v. Memorial Hermann Hosp. Sys.*, 110 S.W.3d 216, 222 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. The required statutory elements must be present within the four corners of the report and, thus, the courts will not make inferences to supply omitted elements. *See, e.g.*, *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (per curiam) (stating that court could not infer causation where expert report stated that plaintiff might have had "the possibility of a better outcome," but did not explain how the defendant's conduct caused the injury); *Russ v. Titus Hosp. Dist.*, 128 S.W.3d 332, 343 (Tex. App.—Texarkana 2004, pet. denied) (stating that it was not an abuse of discretion for the trial court to dismiss a suit against some parties where ascertaining the standard of care as to them required an inference; expert report detailed omissions of two nurses but did not address what conduct was necessary or required).

In *Palacios*, a case involving a patient's fall from a bed, the plaintiffs relied mainly on one statement in the expert report to establish the standard of care: "Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized." 46

S.W.3d at 879-80. Holding that this statement was not a statement of a standard of care, the supreme court reasoned that neither the trial court nor the defendant would be able to tell from this conclusory statement whether the expert believed that the standard of care required the defendant "to have monitored Palacios more closely, restrained him more securely, or done something else entirely." *Id.* at 880.

Dr. Lowry's report includes conclusory statements similar to the statement in *Palacios*. He states that on the intake form the triage nurse checked off as "N/A (not applicable)" three areas that "should have been at the top of the concern here," but he does not state what the triage nurse should have done differently in filling out the form. Dr. Lowry's report criticizes Dr. Butter for not conducting a "thorough enough history," for failing to perform a "thorough enough exam to even justify the 'radiculopathy' diagnoses," for not "delv[ing] into the possibility of an OB etiology," and for not taking any labs or x-rays. While in hindsight it may be possible to point out additional steps that could have been taken to diagnose Quinney's MRSA infection, Dr. Lowry's report does not explain what steps an ordinarily prudent physician would have been required to take. Dr. Lowry does reference other doctors in his report when he states that "most doctors I know would automatically be thinking a Gyn/Ob issue is possibly going on here and the 'hip' or low-back pain may be being caused by this." This comment falls short of invoking an appropriate standard of care, which inquires as to what an *ordinarily prudent doctor* would have *done* under the same or similar circumstances. *See Palacios*, 46 S.W.3d at 880.

Dr. Lowry's assessment of Quinney's second visit when, according to his report, she was released just a few hours after showing a fever is also deficient. While Dr. Lowry states that Quinney "should not have been released unless she was afebrile for at least a whole uninterrupted

8

24 hours prior to release," it is not clear that the standard of care required McKenna's staff to wait 24 hours. To the extent that the report states what an ordinarily prudent health-care provider or physician would *not* have done, it is addressing a breach of the standard of care rather than the applicable standard of care itself. *Strom*, 110 S.W.3d at 223.

## CONCLUSION

Because Dr. Lowry's report does not provide enough information to inform McKenna or Dr. Butter of the specific conduct Quinney has called into question or to allow the trial court to determine that Quinney's claims have merit, *see Palacios*, 46 S.W.3d at 878, it was an abuse of discretion for the trial court to find that Dr. Lowry's report was sufficient under the statute. We therefore reverse the trial court's orders denying the defendants' motions to dismiss and remand for further proceedings consistent with this opinion.[2]

---

[2] Because the expert report, although deficient, was timely filed, the trial court has discretion to grant Quinney an extension of time to cure the deficiency. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) (West Supp. 2006); *Wells v. Ashmore*, No. 07-06-0232-CV, 2006 Tex. App. LEXIS 8182, at *8 n.1 (Tex. App.—Amarillo Sept. 15, 2006, no pet. h.); *Longino v. Crosswhite ex rel. Crosswhite*, 183 S.W.3d 913, 917 n.2 (Tex. App.—Texarkana 2006, no pet.).

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Reversed and Remanded

Filed:   November 10, 2006